## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

ST. REGIS MOHAWK TRIBE,　　　　　　）
　　　　　　　　　　　　　　　　　　　）
　　　　　　　　　Plaintiff,　　　　　　　）
　　　　　　　　　　　　　　　　　　　）
　　　　　　　　　　　　　　　　　　　）
　　v.　　　　　　　　　　　　　　　　　）　　Case No. _____
　　　　　　　　　　　　　　　　　　　）
UNITED STATES DEPARTMENT OF　　　）
THE INTERIOR; DIRK KEMPTHORNE,　　）　　**08 CIV. 0208**
in his official capacity as SECRETARY OF　）
THE INTERIOR; JAMES E. CASON, in his　）
official capacity as ASSOCIATE DEPUTY　）
SECRETARY OF THE INTERIOR; and CARL J. ）
ARTMAN, in his official capacity as ASSOCIATE ）
SECRETARY OF THE INTERIOR  FOR　　　）
INDIAN AFFAIRS,　　　　　　　　　　　）
　　　　　　　　　　　　　　　　　　　）
　　　　　　　　　Defendants.　　　　　　）
_____）

## COMPLAINT

### Introduction

1.　　　Plaintiff St. Regis Mohawk Tribe (the "Tribe") seeks this Court's review,

pursuant to the Administrative Procedure Act, of the decision by the United States Department of

the Interior ("DOI") denying the Tribe's application to take certain land in New York into trust

for it.  The Tribe requested in August 1996 that DOI acquire trust land in Sullivan County, New

York, adjacent to the Monticello Raceway, for the development and operation of a tribal casino.

On April 4, 2000, DOI made a determination, supported by 16 pages of detailed findings of fact,

that the proposed acquisition would be in the best interest of the Tribe, and would not be

detrimental to the surrounding community.  In December 2006 DOI issued a 6-page Finding of

No Significant [Environmental] Impact with respect to the proposed acquisition.  On February

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____

18, 2007, New York Governor Eliot Spitzer concurred in DOI's determination that the proposed acquisition would be in the best interest of the Tribe, and would not be detrimental to the surrounding community. These agency findings, and the Governor's concurrence therein, satisfied the conditions under the Indian Gaming Regulatory Act, 25 U.S.C. § 2719(b)(1)(A), for Indian gaming to be conducted on this land once it was taken into trust for the Tribe.

2.     The only remaining step was for DOI to take the land into trust pursuant to Section 5 of the Indian Reorganization Act, 25 U.S.C. §465, and the implementing regulations at 25 C.F.R. Part 151, general provisions that apply to all land acquisitions for Indians for any purpose. DOI had advised Governor Spitzer's office that this process should be completed within two months of his concurrence. The Eastern Regional Office of the Bureau of Indian Affairs ("BIA") already had recommended that the Tribe's request be granted, as had the BIA's Office of Indian Gaming Management. Nonetheless, DOI delayed and withheld action on the Tribe's request for almost 11 months.

3.     Finally, on January 4, 2008, DOI issued a decision denying the Tribe's application, applying a new and unlawful policy issued the previous day that imposes a stringent new test on acquisitions for a proposed off-reservation casino that is not within commuting distance from the reservation. The DOI's decision found that the proposed gaming facility here was not within a "commutable distance" from the Tribe's reservation, and that the "negative impacts" of the trust acquisition "could be considerable" because either (1) tribal members on the reservation would not take jobs at the new facility—in which case the facility would not benefit them and would not alleviate tribal unemployment—or (2) tribal members would move to Sullivan County to take jobs at the facility, in which case their departure from the reservation "could have serious and far-reaching implications for the remaining tribal community and its

2

continuity as a community." This rationale is contradicted by DOI's previous finding of fact, in conjunction with its April 6, 2000, two-part determination, that "[t]here are no foreseeable adverse impacts on the Tribe associated with the acquisition of the Monticello property in trust for a gaming and entertainment center." The January 4, 2008 decision is contrary to the Department's own previous findings regarding the Tribe's application, the relevant facts, and applicable law, and should be held unlawful and set aside by this Court.

### Jurisdiction and Venue

4.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1362 and 5 U.S.C. § 706. This Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 1361, 1651, 2201, and 2202, and 5 U.S.C. § 706.

5.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(e) because this is an action in which Defendant is an officer and employee of the United States acting in an official capacity, and the property that is the subjection of the action is situated within this judicial district.

### The Parties

6.    The St. Regis Mohawk Tribe is a federally recognized Indian tribe whose reservation is located at Akwesasne, New York, along the northern border with Canada. The Tribe has about 12,200 members, with about 6,500 members residing on or near the reservation. The population in 1997 was 8,630 members with about 4,193 residing on or near the reservation. The Tribe qualifies under the Indian Gaming Regulatory Act, 25 U.S.C. §§2701 et seq., to operate what is known as class III gaming. The Tribe operates a small casino and a bingo hall on its reservation but seeks to open a new and larger gaming facility in the Catskills area of New York, in Sullivan County, where the New York Legislature

authorized the development of up to three Indian casinos to promote economic growth in a depressed region.

7.     The United States Department of the Interior is a federal agency that includes the Bureau of Indian Affairs, that administers the Indian Reorganization Act, 25 U.S.C. §§ 461 *et seq.*, and that processes applications by a tribe for the acquisition of lands in trust for the tribe by the United States.  The Department also administers certain provisions of the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721.

8.     Dirk Kempthorne is the Secretary of the Interior and is charged by law with carrying out the duties and responsibilities of the United States as trustee for the Tribe. In his official capacity, Secretary Kempthorne is authorized to acquire lands for Indian tribes in the name of the United States to hold in trust for the Indian tribe, and to take action on a tribe's request to acquire such lands.  Secretary Kempthorne is sued in his official capacity.

9.     James E. Cason is the Associate Deputy Secretary of the Interior.  In his official capacity, under delegated authority, he signed the January 4, 2008 DOI decision denying the Tribe's application.

10.     Carl J. Artman is the Assistant Secretary of the Interior for Indian Affairs.  In his official capacity, he signed the January 3, 2008 memorandum entitled "Guidance on taking off-reservation land into trust for gaming purposes."

## Statutory and Regulatory Requirements

11.     Section 5 of the Indian Reorganization Act ("IRA"), 25 U.S.C. §465, enacted in 1934, authorizes the Secretary of the Interior to acquire lands for Indian tribes in the name of the United States to hold in trust for the Indian tribe, and to take action on a tribe's request to acquire such lands.  One of the principal congressional purposes behind the IRA was the

economic advancement of Indian communities. *State of South Dakota v. Dept. of Interior,* 423 F. 3d 790, 798-99 (8th Cir. 2007). This statute applies to all tribal requests to take land into trust for any purpose.

12.     The Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721 ("IGRA"), enacted in 1988, provides "a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments[,] . . . to ensure that the Indian tribe is the primary beneficiary of the gaming operation, . . . and to protect such gaming as a means of generating tribal revenue." 25 U.S.C. § 2702.

13.     Under Section 20 of IGRA, 25 U.S.C. § 2719, tribes are prohibited from engaging in any gaming on land acquired after the date of IGRA's enactment, October 17, 1988, unless the land comes within certain exceptions. One exception is established by §20(b)(1)(A) of IGRA, 25 U.S.C.§ 2719 (b)(1)(A), which provides that the prohibition of gaming on post-1988 land does not apply when:

> the Secretary, after consultation with the Indian tribe and appropriate State and local officials, including officials of other nearby Indian tribes, determines that a gaming establishment on newly acquired lands [1] would be in the best interest of the Tribe and its members, and [2] would not be detrimental to the surrounding community, but only if the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination . . . .

This exception is commonly referred to as the "two-part determination." Subsection 2719(c) of IGRA further instructs that "[n]othing in [Section 20] shall affect the authority and responsibility of the Secretary to take land into trust."

14.     The Indian Reorganization Act is a broad remedial statute intended to redress the excessive taking of Indian lands and corresponding economic hardship imposed on Indian

tribes and Indian people. The Act creates a broad program for the acquisition of Indian lands. The Act's purposes include conserving and managing Indian lands, promoting tribal self-government and tribal economic development. Section 5 of the Act is very general in nature and authorizes the Secretary of the Interior to acquire lands that are either "within or without existing reservations," for Indian tribes in the name of the United States to hold in trust for the Indian tribe. The criteria governing when land will be taken into trust for an Indian tribe under this statute were promulgated by DOI in regulations at 25 C.F.R. Part 151. The criteria relevant to this case appear at 25 C.F.R. §§ 151.10(a)-(c)&(e)-h) and 151.11.

    15.    25 C.F.R. § 151.10, which applies to both on- reservation and off-reservation land acquisitions, provides in relevant part that:

> The Secretary will consider the following criteria in evaluating requests for the acquisition of land in trust status when the land is located within or contiguous to an Indian reservation, and the acquisition is not mandated:
>     (a) The existence of statutory authority for the acquisition and any limitations contained in such authority;
>     (b) The need of the individual Indian or the tribe for additional land;
>     (c) The purposes for which the land will be used;
>     (d) [*provision relating to acquisition for individual Indian, not applicable to tribal application*];
>     (e) If the land to be acquired is in unrestricted fee status, the impact on the State and its political subdivisions resulting from the removal of the land from the tax rolls;
>     (f) Jurisdictional problems and potential conflicts of land use which may arise; and
>     (g) If the land to be acquired is in fee status, whether the Bureau of Indian Affairs is equipped to discharge the additional responsibilities resulting from the acquisition of the land in trust status.
>     (h) The extent to which the applicant has provided information that allows the Secretary to comply with 516 DM 6, appendix 4, National Environmental Policy Act Revised Implementing Procedures, and 602 DM 2, Land Acquisitions: Hazardous Substances Determinations.

    16.    25 C.F.R. § 151.11 provides in relevant part that:

> The Secretary shall consider the following requirements in evaluating tribal requests for the acquisition of lands in trust status, when the land is located outside of and noncontiguous to the tribe's reservation, and the acquisition is not mandated:

(a) The criteria listed in Sec. 151.10 (a) through (c) and (e) through (h);

(b) The location of the land relative to state boundaries, and its distance from the boundaries of the tribe's reservation, shall be considered as follows: as the distance between the tribe's reservation and the land to be acquired increases, the Secretary shall give greater scrutiny to the tribe's justification of anticipated benefits from the acquisition. The Secretary shall give greater weight to the concerns raised pursuant to paragraph (d) of this section.

(c) Where land is being acquired for business purposes, the tribe shall provide a plan which specifies the anticipated economic benefits associated with the proposed use.

(d) Contact with state and local governments pursuant to Sec. 151.10 (e) and (f) shall be completed as follows: Upon receipt of a tribe's written request to have lands taken in trust, the Secretary shall notify the state and local governments having regulatory jurisdiction over the land to be acquired. The notice shall inform the state and local government that each will be given 30 days in which to provide written comment as to the acquisition's potential impacts on regulatory jurisdiction, real property taxes and special assessments.

17. The regulations provide that if the Secretary denies a request, he must "advise the applicant of that fact and the reasons therefor in writing." 25 C.F.R. §151.12(a).

## The Tribe's Request to Acquire Land In Trust

18.    On August 1, 1996, the Tribe submitted a request to the Secretary of the Interior to acquire a 29.31 acre parcel in trust for gaming purposes in the Village of Monticello, in Sullivan County, New York, adjacent to the Monticello Raceway, an existing harness racing track that has accommodated licensed gaming for almost 50 years. The Eastern Regional Office of the BIA issued a Finding of No Significant Impact ("FONSI") on September 24, 1998, based on an Environmental Assessment ("EA") dated April 22, 1998. The Environmental Assessment was revised in July 1999, and the BIA Eastern Regional Office issued a revised FONSI on October 28, 1999, and recommended approval of the Tribe's trust application on October 29, 1999.

**DOI's Two-Part Determination In Favor of the Project**

19.    On April 4, 2000, Kevin Gover, then the Assistant Secretary for Indian

Affairs, acting for the Secretary under delegated authority, made the "two-part

determination" required by IGRA Section 20(b)(1)(A), and wrote to New York Governor

Pataki requesting his concurrence in the determination. His letter stated:

> Based on the application and its supporting documentation, including
> comments received from State and local government officials, and
> officials of nearby tribes, the Department has made findings of fact
> supporting the two-part determination required under Section 20(b)(1)(A)
> of the IGRA.
>
> Based on these findings, I have determined that the gaming establishment
> in the 29.31 acre parcel of land located in Monticello New York would be
> in the best interest of the Tribe and its members and would not be
> detrimental to the surrounding community.

20.    Assistant Secretary Gover's letter enclosed 16 pages of detailed Findings of

Fact supporting the two-part determination. In support of the determination that the

acquisition would be in the best interests of the Tribe and its members, the DOI found that:

        a.    the casino was projected to generate approximately $583 million net
revenues to the Tribe over its initial seven years of operation;

        b.    it was projected that approximately 260 tribal members will be
employed directly by the casino, earning an estimated total of $6.6 million annually,
and that approximately $23 million in contracts will be awarded to tribally-owned
construction enterprises engaged in the construction of the casino;

        c.    the Tribe had some 8,630 enrolled members, with 4,193 living on or
near the reservation; approximately 600 members were unemployed and seeking
work; no estimate had been made of the number of reservation residents who would
relocate to the casino, but tribal members leaving for jobs at the casino "could reduce
reservation unemployment by a substantial percentage;"

        d.    significant training opportunities will be provided to tribal members as
a result of the casino;

        e.    revenues from the casino will enable the Tribe to expand its
reservation senior citizen center, to construct a day care facility and

ambulatory/nursing home, to expand the sewage system, extend a water line to serve the entire reservation, and connect a natural gas pipeline to the reservation, as well as provide funds for scholarships and post-secondary education tuition assistance; and

     f.     "[t]here are no foreseeable adverse impacts on the Tribe associated with the acquisition of the Monticello property in trust for a gaming and entertainment center."

21.     In support of the determination that the acquisition would not be detrimental to the surrounding community, the Findings of Fact noted that State and local officials had been consulted, that the Town of Thompson supported the agreement, and that a Cooperation Agreement met the concerns of the Village of Monticello and of Sullivan County and addressed various project impacts. The Findings of Fact also concluded that the casino would boost the economy of the region, generate employment and income for local residents, and generate revenues from hotel taxes to local governments. The Findings of Fact stated: "If the Governor of the State of New York concurs with this two-part Secretarial determination, the Monticello Property will be taken into trust pursuant to the requirements of 25 CFR Part 151."

22.     Thereafter further efforts to complete the process and take the Monticello Raceway site into trust for the Tribe were held in abeyance for several years while the Tribe unsuccessfully pursued a different casino project at another site in the Catskill region. On August 1, 2005, the Tribe reactivated its "fee to trust" application for the Monticello Raceway site. The Tribe and the Governor were advised by duly-authorized DOI officials that the two-part determination issued in April 2000 was still valid and could still be concurred in by the Governor.

**DOI's Finding of No Significant Environmental Impact**

23.     DOI advised the Tribe that revisions to the Environmental Assessment needed to be made, and the Tribe revised the assessment. On October 31, 2006, the BIA Eastern Regional Office submitted the final Environmental Assessment to the BIA Central Office with a recommendation to take the land into trust and to issue a FONSI. The assessment noted that acquisition would create jobs for tribal members, both at the casino site and on the reservation:

> It is envisioned that revenue from the project will allow the Tribe to expand its tribal government operations in all departments creating career opportunities for tribal members as well as residents of the surrounding area. Thousands of permanent jobs will be created in management, accounting, sales, marketing, food services, facilities maintenance, security and other segments of the gaming industry. In addition, as the Tribe expands its programs and services there will be a need to construct new buildings, infrastructure and other projects that will further increase employment and training opportunities for tribal members. Overall, the casino project will provide employment to 260 tribal members earning an estimated $6.6 million annually. In addition, it is estimated that approximately $23 million in contracts will be awarded to tribally-owned construction enterprises engaged in the construction and renovation work related to the proposed casino project.

24.     On December 21, 2006, Associate Deputy Secretary of the Interior James Cason signed the FONSI for the proposed agency action: "to approve the [Tribe's] request to take approximately 29.31 acres of fee land into trust for the purpose of Class III gaming," and transmitted this FONSI to the Tribe. The FONSI noted that:

> a.     "Gaming is a unique opportunity for Indian tribes to improve the socio-economic conditions and to enhance the living standards and quality of life for Indian people through the development of a stable source of income and employment. … The Tribe needs a stable economic base to address problems stemming from high unemployment, insufficient housing and inadequate health care."

> b.     "As evidenced by the financial success of other casinos and financial projections for the proposed casino, this project clearly presented the best opportunity for a financially successful venture."

c.    "The proposed project will improve socioeconomic conditions for both the Tribe and Sullivan County. The proposed project will create hundreds of jobs for the Tribe and local communities. ... The increased costs to local governments for public schools, roads, police, emergency medical care, solid waste, utilities and other socioeconomic impacts will be fully mitigated through the local agreements between the Tribe and local governments."

25.    The Department's issuance of the FONSI was the subject of an action brought in this Court, in which plaintiffs asserted that preparation of an environmental impact statement was required under the National Environmental Policy Act ("NEPA"). Sullivan County Farm Bureau, et al. v. United States Department of the Interior, et al., Civ. No. 07-CV-1-1011 (CLB) (S.D.N.Y. filed Feb. 13, 2007). That case was dismissed without prejudice on October 22, 2007. Under a stipulation and order in that case (Docket entry 8, entered April 18, 2007), if the Secretary decides to acquire the lands in Monticello in trust for the Tribe and publishes a notice to that effect, and if plaintiffs in that action file a new lawsuit challenging the determination under NEPA within thirty days of the notice, then the Secretary will not take the lands into trust until sixty days after the district court issues a final decision resolving whether the Department complied with NEPA.

## The Governor's Concurrence

26.    On February 18, 2007, in a letter to Secretary Kempthorne, the Governor of New York, Eliot Spitzer, concurred in DOI's April 2000 two-part determination, and urged the Secretary to take the land into trust expeditiously. Governor Spitzer's letter also indicated that a gaming compact had been entered into between New York and the Tribe to govern gaming on the Monticello site. The New York State legislative had authorized up to three tribal casinos in the Catskills region in October 2001. N.Y. Exec. Law § 12.

### DOI's Delay in Acting

27.     The DOI had advised the Governor of New York that the Tribe's application

would be ripe for final action when the DOI received the Governor's concurrence in the two-

part secretarial determination, which occurred in February 2007. DOI's previous findings

and actions in connection with the two-part determination and the FONSI, together with

Governor Spitzer's concurrence therein, effectively satisfied all of the relevant factors

established by 25 C.F.R. §§ 151.10 and 151.11 for taking the Monticello Raceway site into

trust for the Tribe. From February 2007 until issuance of the DOI denial of the application

on January 4, 2008, DOI did not identify any deficiencies in the request nor state that any

further information or data was required to process the request. The Eastern Regional Office

of the BIA had recommended that the request be granted, as had the BIA's Office of Indian

Gaming Management.

28.     George Skibine, Acting Deputy Assistant Secretary for Policy and Economic

Development, had advised the New York Governor's office that DOI would complete its

review of the land-into-trust request within two months of receiving the Governor's

concurrence. Yet, without any explanation, DOI failed to act on the request.

29.     On information and belief, DOI did not act on the Tribe's request because

Secretary Kempthorne is personally opposed to off-reservation Indian gaming but there was

no reasonable or principled justification for rejecting the Tribe's request in light of the

findings and determinations that already had been made.

### DOI's New Guidance on Off-Reservation Gaming
### Acquisitions and the Final Decision

30.     On January 3, 2008, DOI Assistant Secretary Carl Artman issued a

memorandum entitled "Guidance on taking off-reservation land into trust for gaming

purposes." This so-called "Guidance" (attached hereto as Exhibit A) is based on the stated

view that IGRA "was not intended to encourage the establishment of Indian gaming facilities

far from existing reservations." It purports to clarify the application of 25 C.F.R. 151.11(b),

but actually imposes additional, new criteria to be applied in reviewing applications for off-

reservation gaming acquisitions, in contravention of the IGRA and the current regulations at

25 C.F.R. Part 151, without notice to the regulated parties, and in spite of the DOI's ongoing

rulemaking activity to implement Section 20 of the IGRA (*see* Gaming on Trust Lands

Acquired After October 17, 1988, 71 Fed. Reg. 58769 (proposed October 5, 2006) (to be

codified at 25 C.F.R. pt. 292)).

     31.    Among other new requirements, the January 3, 2008 Guidance imposes a new

"commutability" test applicable to all applications to acquire lands in trust for gaming

purposes. The rationale for this test is stated as follows in the Guidance:

> If the gaming facility is not within a commutable distance of the reservation, tribal
> members who are residents of the reservation will either: a) not be able to take
> advantage of the job opportunities if they desire to remain on the reservation; or
> b) be forced to move away from the reservation to take advantage of the job
> opportunity.

> In either case, the negative impacts on reservation life could be considerable. In
> the first case, the operation of the gaming facility would not directly improve the
> employment rate of tribal members living on the reservation. ....

> In the second case, the existence of the off-reservation facility would require or
> encourage reservation residents to leave the reservation for an extended period to
> take advantage of the job opportunities created by the tribal gaming facility. The
> departure of a significant number of reservation residents and their families could
> have serious and far-reaching implications for the remaining tribal community
> and its continuity as a community.

     32.    According to the Guidance, "no application to take land into trust beyond a

commutable distance from the reservation should be granted unless it carefully and

comprehensively analyzes the potential negative impacts on reservation life and clearly

demonstrates why these are outweighed by the financial benefits of tribal ownership in a distant gaming facility." The Guidance further identifies the following issues that need to be addressed in the application:

> What is the unemployment rate on the reservation? How will it be affected by the operation of the gaming facility?
>
> How many tribal members (with their dependents) are likely to leave the reservation to seek employment at the gaming facility? How will their departure affect the quality of reservation life?
>
> How will the relocation of reservation residents affect their long-term identification with the tribe and the eligibility of their children and descendants for tribal membership?
>
> What are the specifically identified on-reservation benefits from the proposed gaming facility? Will any of the revenue be used to create on-reservation job opportunities?

33.    On January 4, 2008—just one day after promulgating the Guidance—DOI issued its final decision denying the Tribe's application (the "DOI Denial", attached hereto as Exhibit B) and final decisions denying off-reservation "land into trust" applications of ten other tribes. (The other tribes had not yet completed the two-part determination and concurrence process under IGRA.) These decisions were all based upon the January 3 Guidance, often utilizing the language of the Guidance nearly verbatim, although the DOI Denial made no reference to, or acknowledgement of, the new Guidance.

34.    The DOI Denial was signed by James Cason, the Associate Deputy Secretary of the Interior – the same official who had previously signed the FONSI on December 21, 2006, thereby clearing the way for the project. The DOI Denial acknowledged that a high unemployment rate, with its attendant social ills, is already a problem on the Tribe's reservation. Nonetheless, the DOI Denial asserted that, because the proposed gaming facility is not within a commutable distance of the reservation, it would not "directly improve" the

unemployment rate on the reservation; that Tribal members on the reservation either would not be able to take advantage of the casino job opportunities or else would be forced to move away from the reservation to do so; and that "[t]he departure of a significant number of reservation residents and their families could have serious and far-reaching implications for the remaining tribal community and its continuity as a community."

35.    The DOI Denial concluded that "[w]hile the financial benefits of the proposed gaming facility might create revenues for the Tribe and may mitigate some potential negative impacts, the Tribe's application fails to carefully address and comprehensively analyze the potential negative impacts on reservation life and does not clearly demonstrate why these negative impacts should be out weighed by the financial benefits of tribal ownership of a remote gaming facility."

36.    The Tribe first learned of the Guidance only after the final decision was issued on its application, when the Guidance was published on a website. The Tribe was denied the opportunity to provide any information to DOI on the factors set out in the Guidance before the DOI Denial was issued, when in fact the Tribe could easily have satisfied the new requirements even assuming they are valid.

37.    The DOI Denial constitutes final agency action by DOI on the Tribe's application.

## FIRST CLAIM FOR RELIEF
## VIOLATION OF THE APA -
## PROMULGATION OF AN INVALID LEGISLATIVE
## RULE

38.    The allegations of paragraphs 1 through 37 are incorporated herein.

39.    The January 3, 2008 Guidance promulgated by DOI is invalid because it establishes new requirements regarding off-reservation Indian gaming that are inconsistent

with the provisions of the IGRA. The Secretary cannot, under the guise of making a "land into trust" determination under the IRA, impose new or additional requirements regarding the approval of off-reservation Indian gaming, especially when those requirements are based upon the erroneous premise that IGRA Section 20 establishes a restrictive policy towards Indian gaming on lands acquired in trust after the enactment of IGRA.

40.     The January 3, 2008 Guidance is also invalid because it constitutes a legislative rule promulgated in contravention of the notice and comment requirements of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551, 553, and is not in accordance with law.

41.     The January 3, 2008 Guidance was adopted in a manner that was arbitrary and capricious.

42.     As a result, this Court should hold the January 3, 2008 Guidance unlawful and set it aside under the judicial review provisions of the APA, 5 U.S.C. §§ 701-706.

### SECOND CLAIM FOR RELIEF
### VIOLATION OF THE APA -
### AGENCY ACTION THAT IS ARBITRARY, CAPRICIOUS,
### AN ABUSE OF DISCRETION, AND OTHERWISE
### NOT IN ACCORDANCE WITH THE LAW

43.     The allegations of paragraphs 1 through 42 are incorporated herein.

44.     The APA provides that a court reviewing a final agency action "shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law ...."  5 U.S.C. § 706(2)(A).

45.     The DOI Denial relies on the invalid January 3, 2008 Guidance, on factors that are not set forth in the governing regulations and on findings or conclusions that are not

supported by evidence before the agency and are contrary to findings and conclusions previously made by DOI in the same matter.

46.     The DOI Denial is arbitrary, capricious, an abuse of discretion, and not in accordance with law.

### THIRD CLAIM FOR RELIEF
### VIOLATION OF THE APA -
### IMPROPER APPLICATION OF THE
### NEW REQUIREMENTS IN THE GUIDANCE

47.     The allegations of paragraphs 1 through 46 are incorporated herein.

48.     The APA prohibits an agency from imposing new rules retroactively, or on a pending application.

49.     DOI cannot lawfully apply the new requirements of the January 3, 2008 Guidance to the Tribe's long-standing application.

50.     DOI's application of the new requirements of the Guidance to the Tribe's application is arbitrary, capricious, an abuse of discretion, and not in accordance with law.

### FOURTH CLAIM FOR RELIEF
### VIOLATION OF THE APA -
### DUE PROCESS - FAILURE TO PROVIDE FAIR NOTICE
### OF THE NEW REQUIREMENTS IN THE GUIDANCE

51.     The allegations of paragraphs 1 through 50 are incorporated herein.

52.     Under the fair notice doctrine, even when a new agency interpretation of a rule or statute is reasonable or otherwise lawful, traditional notions of due process incorporated into administrative law mandate that the interpretation cannot be imposed if the regulated party was not given fair notice of the requirement.

53.     The DOI Denial is arbitrary and capricious, an abuse of discretion, and contrary to law insofar as it is based upon the Guidance issued January 3, 2008 because the

Tribe was provided no notice of the Guidance and no opportunity to address the new requirements it mandates.

## PRAYER FOR RELIEF

WHEREFORE, the Tribe hereby requests the following relief:

1.    A decision holding unlawful and setting aside the DOI Denial;

2.    An order directing Secretary Kempthorne to grant the Tribe's "land into trust" application;

3.    An order invalidating the January 3, 2008 Guidance; and

4.    Such other relief as is just and equitable.

Respectfully submitted,

Mark P. Weingarten (MW-1624)
Richard Bemporad (RB-8778)
Delbello Donnellan Weingarten Wise &
Wiederkehr, LLP
The Gateway Building
One North Lexington Avenue
White Plains, NY  10601
(914) 681-0200

Jerry C. Straus
Michael L. Roy
Marsha K. Schmidt
Hobbs, Straus, Dean & Walker, LLP
2120 L Street, NW, Suite 700
Washington, DC 20037
202-822-8282

Counsel for Plaintiff
St. Regis Mohawk Tribe

Dated:  January 10, 2008

# EXHIBIT A



# United States Department of the Interior

### OFFICE OF THE SECRETARY
### WASHINGTON, D.C. 20240



**Memorandum**

**To:** Regional Directors, Bureau of Indian Affairs
George Skibine, Office of Indian Gaming

**From:** Assistant Secretary Carl Artman

**Date:** January 3, 2008

**Subject:** Guidance on taking off-reservation land into trust for gaming purposes

The Department currently has pending 30 applications from Indian tribes to take off-reservation land into trust for gaming purposes as part of the 25 U.S.C. § 2719(b)(1)(A) two-part determination. Many of the applications involve land that is a considerable distance from the reservation of the applicant tribe; for example, one involves land that is 1400 miles from the tribe's reservation. Processing these applications is time-consuming and resource-intensive in an area that is constrained by a large backlog and limited human resources.

The decision whether to take land into trust, either on-reservation or off-reservation, is discretionary with the Secretary. Section 151.11 of 25 C.F.R. Part 151 sets forth the factors the Department will consider when exercising this discretionary authority with respect to "tribal requests for the acquisition of lands in trust status, when the land is located outside of and noncontiguous to the tribe's reservation." Section 151.11(b) contains two provisions of particular relevance to applications that involve land that is a considerable distance from the reservation. It states that, as the distance between the tribe's reservation and the land to be acquired increases, the Secretary shall give:

　　1)　　greater scrutiny to the tribe's justification of anticipated benefits from the acquisition; and

　　2)　　greater weight to concerns raised by state and local governments as to the acquisition's potential impacts on regulatory jurisdiction, real property taxes and special assessments.

Part 151, however, does not further elaborate on how or why the Department is to give "greater scrutiny" and "greater weight" to these factors as the distance increases. The purpose of this guidance is to clarify how those terms are to be interpreted and applied,

1

particularly when considering the taking of off-reservation land into trust status for gaming purposes.

## Core Principles

As background to the specific guidance that follows, it is important to restate the core principles that underlie the Part 151 regulations and that should inform the Department's interpretation of, and decisions under, those regulations. The Part 151 regulations implement the trust land acquisition authority given to the Secretary by the Indian Reorganization Act of 1934 (IRA), 25 U.S.C. § 465. The IRA was primarily intended to redress the effects of the discredited policy of allotment, which had sought to divide up the tribal land base among individual Indians and non-Indians, and to destroy tribal governments and tribal identity. To assist in restoring the tribal land base, the IRA gives the Secretary the authority to: 1) return "to tribal ownership the remaining surplus lands of any Indian reservation" that had been opened to sale or disposal under the public land laws; 2) consolidate Indian ownership of land holdings within reservations by acquiring and exchanging interests of both Indians and non-Indians; and 3) acquire, in his discretion, interests in lands "within or without existing reservations". The IRA contains also provisions strengthening tribal governments and facilitating their operation. The policy of the IRA, which was just the opposite of allotment, is to provide a tribal land base on which tribal communities, governed by tribal governments, could exist and flourish. Consistent with the policy, the Secretary has typically exercised discretion regarding trust land acquisition authority to take lands into trust that are within, or in close proximity to, existing reservations.

The IRA has nothing directly to do with Indian gaming. The Indian Gaming Regulatory Act of 1988 (IGRA), 25 U.S.C. § 2701 et seq., adopted more than 50 years after the IRA, sets the parameters of Indian gaming. One requirement is that if gaming is to occur on off-reservation lands those lands must be trust lands "over which an Indian tribe exercises governmental power." The authority to acquire trust lands, however, is derived from the IRA; no trust land acquisition authority is granted to the Secretary by IGRA. The Department has taken the position that although IGRA was intended to promote the economic development of tribes by facilitating Indian gaming operations, it was not intended to encourage the establishment of Indian gaming facilities far from existing reservations. Whether land should be taken into trust far from existing reservations for gaming purposes is a decision that must be made pursuant to the Secretary's IRA authority.

## Implementation of Guidance

This guidance should be implemented as follows:

1. All pending applications or those received in the future should be initially reviewed in accordance with this guidance. The initial review should precede any effort (if it is not already underway) to comply with the NEPA requirements of section 151.10(h).

2

2.  If the initial review reveals that the application fails to address, or does not adequately address, the issues identified in this guidance, the application should be denied and the tribe promptly informed. This denial does not preclude the tribe from applying for future off-reservation acquisitions for gaming or other purposes. However, those future applications will be subject to these same guidelines.

3.  A greater scrutiny of the justification of the anticipated benefits and the giving greater weight to the local concerns must still be given to all off-reservation land into trust applications, as required in 25 C.F.R. § 151.11(b). This memorandum does not diminish that responsibility, but only provides guidance for those applications that exceed a daily commutable distance from the reservation.

Greater Scrutiny of Anticipated Benefits

The guidance in this section applies to all applications, pending or yet to be received, that involve requests to take land into trust that is off-reservation. Reviewers must, in accordance with the regulations at 25 C.F.R. 151.11(b), "give greater scrutiny to the tribe's justification of anticipated benefits from the acquisition" as the distance between the acquisition and the tribe's reservation increases. The reviewer should apply this greater scrutiny as long as the requested acquisition is off-reservation regardless of the mileage between the tribe's reservation and proposed acquisition. If the proposed acquisition exceeds a commutable distance from the reservation the reviewer, at a minimum, should answer the questions listed below to help determine the benefits to the tribe. A commutable distance is considered to be the distance a reservation resident could reasonably commute on a regular basis to work at a tribal gaming facility located off-reservation.

As noted above, section 151.11(b) requires the Secretary to "give greater scrutiny to the tribe's justification of anticipated benefits from the acquisition" of trust land "as the distance between the tribe's reservation and the land to be acquired increases." The reason for this requirement is that, as a general principle, the farther the economic enterprise - in this case, a gaming facility - is from the reservation, the greater the potential for significant negative consequences on reservation life.

Tribes typically view off-reservation gaming facilities as providing two economic benefits to the tribe. The first is the income stream from the gaming facility, which can be used to fund tribal services, develop tribal infrastructure, and provide per capita payments to tribal members, and thus can have a positive effect on reservation life. Obviously, the income stream from a gaming facility is not likely to decrease as the distance from the reservation increases. In fact, off-reservation sites are often selected for gaming facilities because they provide better markets for gaming and potentially greater income streams than sites on or close to the reservation.

The second benefit of off-reservation gaming facilities is the opportunity for job training and employment of tribal members. With respect to this benefit, the location of the

3

gaming facility can have significant negative effects on reservation life that potentially worsen as the distance increases. If the gaming facility is not within a commutable distance of the reservation, tribal members who are residents of the reservation will either: a) not be able to take advantage of the job opportunities if they desire to remain on the reservation; or b) be forced to move away from the reservation to take advantage of the job opportunity.

In either case, the negative impacts on reservation life could be considerable. In the first case, the operation of the gaming facility would not directly improve the employment rate of tribal members living on the reservation. High on-reservation unemployment rates, with their attendant social ills, are already a serious problem on many reservations. A gaming operation on or close to the reservation allows the tribe to alleviate this situation by using their gaming facility as a conduit for job training and employment programs for tribal members. Provision of employment opportunities to reservation residents promotes a strong tribal government and tribal community. Employment of tribal members is an important benefit of tribal economic enterprises.

In the second case, the existence of the off-reservation facility would require or encourage reservation residents to leave the reservation for an extended period to take advantage of the job opportunities created by the tribal gaming facility. The departure of a significant number of reservation residents and their families could have serious and far-reaching implications for the remaining tribal community and its continuity as a community. While the financial benefits of the proposed gaming facility might create revenues for the applicant tribe and may mitigate some potential negative impacts, no application to take land into trust beyond a commutable distance from the reservation should be granted unless it carefully and comprehensively analyzes the potential negative impacts on reservation life and clearly demonstrates why these are outweighed by the financial benefits of tribal ownership in a distant gaming facility.

As stated above, some of the issues that need to be addressed in the application if the land is to be taken into trust is off-reservation and for economic development are:

What is the unemployment rate on the reservation? How will it be affected by the operation of the gaming facility?

How many tribal members (with their dependents) are likely to leave the reservation to seek employment at the gaming facility? How will their departure affect the quality of reservation life?

How will the relocation of reservation residents affect their long-term identification with the tribe and the eligibility of their children and descendants for tribal membership?

What are the specifically identified on-reservation benefits from the proposed gaming facility? Will any of the revenue be used to create on-reservation job opportunities?

4

As long as it remains the policy of the Federal government to support and encourage growth of reservations governed by tribal governments, these are important questions that must be addressed before decisions about off-reservation trust land acquisitions are made. The Department should not use its IRA authority to acquire land in trust in such a way as to defeat or hinder the purpose of the IRA. It should be noted that tribes are free to pursue a wide variety of off-reservation business enterprises and initiatives without the approval or supervision of the Department. It is only when the enterprises involve the taking of land into trust, as is required for off-reservation Indian gaming facilities, that the Department must exercise its IRA authority.

Greater Weight

Section 151.11(b) also requires the Secretary to give "greater weight" than he might otherwise to the concerns of state and local governments. Under the regulations, state and local governments are to be immediately notified of a tribe's application to take land into trust, and are to file their comments in writing no later than 30 days after receiving notice. The reviewer must give a greater weight to the concerns of the state and local governments no matter what the distance is between the tribe's reservation and the proposed off-reservation acquisition. This is the second part of the two part review required by section 151.11(b).

The regulations identify two sets of state and local concerns that need to be given "greater weight:" 1) jurisdictional problems and potential conflicts of land use; and 2) the removal of the land from the tax rolls. The reason for this requirement of giving "greater weight" is two-fold. First, the farther from the reservation the proposed trust acquisition is, the more the transfer of Indian jurisdiction to that parcel of land is likely to disrupt established governmental patterns. The Department has considerable experience with the problems posed by checkerboard patterns of jurisdiction. Distant local governments are less likely to have experience dealing with and accommodating tribal governments with their unique governmental and regulatory authorities. Second, the farther from the reservation the land acquisition is, the more difficult it will be for the tribal government to efficiently project and exercise its governmental and regulatory powers.

With respect to jurisdictional issues, the application should include copies of any intergovernmental agreements negotiated between the tribe and the state and local governments, or an explanation as to why no such agreements exist. Failure to achieve such agreements should weigh heavily against the approval of the application.

With respect to land use issues, the application should include a comprehensive analysis as to whether the proposed gaming facility is compatible with the current zoning and land use requirements of the state and local governments, and with the uses being made of adjacent or contiguous land, and whether such uses would be negatively impacted by the traffic, noise, and development associated with or generated by the proposed gaming facility. Incompatible uses might consist of adjacent or contiguous land zoned or used for: National Parks, National Monuments, Federally designated conservation areas,

National Fish and Wildlife Refuges, day care centers, schools, churches, or residential developments. If the application does not contain such an analysis, it should be denied.

Conclusion

The Office of Indian Gaming will review the current applications. If an application is denied subsequent to this review, the applicant tribe will be notified immediately. Tribes receiving a denial subsequent to this review may resubmit the application with information that will satisfy the regulations. Regional directors shall use this clarification to guide their recommendations or determinations on future applications to take off-reservation land into trust.

6

# EXHIBIT B

1233537
10000090-001

01/04/2008 15:51 FAX  202 273 3153        OIGM                                ☑001/004



THE ASSOCIATE DEPUTY SECRETARY OF THE INTERIOR
WASHINGTON

JAN 0 4 2008

The Honorable Chiefs Lorraine White,
    Barbara A. Lazore, and James W. Ransom
St. Regis Mohawk Tribe
412 State Route 37
Akwesasne, New York 13655

Dear Chiefs:

On December 9, 1998, the St. Regis Mohawk Tribe (Tribe) submitted to the Bureau of
Indian Affairs (BIA) an application to acquire in trust a 29.32-acre parcel of land in
Monticello, Sullivan County, New York (Monticello parcel). The Tribe proposes to
construct, develop, and manage a gaming facility, hotel, and other uses incidental thereto
on the parcel.

**Background**

In explaining the Department of the Interior's (Department) decision, it is important to
begin by restating the core principles that underlie the land acquisitions regulations. The
Part 151 regulations implement the trust land acquisition authority given to the Secretary
by the Indian Reorganization Act of 1934 (IRA), 25 U.S.C. § 465. The IRA was
primarily intended to redress the effects of the discredited policy of allotment, which had
sought to divide up the tribal land base among individual Indians and non-Indians, and to
destroy tribal governments and tribal identity. To assist in restoring the tribal land base,
the IRA gave the Secretary the authority to: 1) return "to tribal ownership the remaining
surplus lands of any Indian reservation" that had been opened to sale or disposal under
the public land laws; 2) consolidate Indian ownership of land holdings within
reservations by acquiring and exchanging interests of both Indians and non-Indians; and
3) acquire, in his discretion, interests in lands "within or without existing reservations."
The IRA also contains provisions strengthening tribal governments and facilitating their
operation. The policy of the IRA, which was just the opposite of allotment, is to provide
a tribal land base on which tribal communities, governed by tribal governments, could
exist and flourish. Consistent with the policy, the Secretary has typically exercised his
trust land acquisition authority to take lands into trust that are within, or in close
proximity to, existing reservations.

The IRA has nothing to do directly with Indian gaming. The Indian Gaming Regulatory
Act (IGRA) 25 U.S.C. § 2701 et. seq., adopted more than 50 years after the IRA, sets the
criteria under which gaming activities can occur on Indian lands. One requirement is that
if gaming is to occur on off-reservation lands, those lands must be trust lands "over which
an Indian tribe exercises governmental power." The authority to acquire trust lands,
however, is derived from the IRA; no trust land acquisition authority is granted to the

Secretary by IGRA. The Department has taken the position that although IGRA was intended to promote the economic development of tribes by facilitating Indian gaming operations, it was not intended to encourage the establishment of Indian gaming facilities on off-reservation lands. Whether off-reservation land should be taken into trust for gaming purposes is a decision that must be made pursuant to the Secretary's IRA authority.

**Compliance with 25 C.F.R. Part 151**

In a letter dated December 21, 2006, the Department made it clear that the Tribe's land-into-trust application would receive a thorough and critical review under the Department's land acquisition regulations in 25 C.F.R. Part 151. Our review of the Tribe's application has identified several concerns, particularly with criteria in 25 C.F.R. §§ 151.3, 151.10(b), 151.10(c), and 151.11(b), as explained below.

**A.    25 C.F.R. 151.3  Land acquisition policy.**

The regulations, in 25 C.F.R. 151.3(a)(3), require the Department to make a determination that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing. The justification provided with your land-into-trust application directed our attention to economic development as the key reason for seeking our approval of this application. The proposed gaming site is approximately 350 miles from the Tribe's existing reservation. The application suggests that the economic benefits to the Tribe would be a projected cash flow from casino operations at the Monticello gaming facility that could then be used to satisfy tribal needs on the reservation and an estimated 260 jobs for tribal members at the casino, with associated job training.

**B.    25 C.F.R. 151.10(b).  The need of the Tribe for additional land.**

The regulations, in 25 C.F.R. 151.10(b), require the Department to evaluate the need of the Tribe for additional land. The Tribe owns approximately 15,000 acres of restricted fee land, which is home to approximately 3,000 tribal members. This application does not address a need for more land to support Tribal housing, government infrastructure, or to resolve local land management conflicts. Rather, the application seeks a particular site of approximately 29.32 acres, located 350 miles away from the reservation, which has been selected due, principally, to its proximity to the primary highway connecting the New York City urban area to the Catskill's resort area.

**C.    25 C.F.R. 151.10(c).  The purposes for which the land will be used.**

The regulations, in 25 C.F.R. 151.10(c), require the Department to consider the purposes for which the land will be used. In this case, the land will be used for the development of a very large off-reservation class III gaming facility. It is worth noting that the Tribe already has at least one class III gaming facility located on its reservation.

2

**D.    25 C.F.R. 151.11(b). The location of the land relative to state boundaries, and its distance from the boundaries of the Tribe's reservation.**

The regulations, in 25 C.F.R. 151.11(b), require the Department to consider the location of the land relative to State boundaries and its distance from the boundaries of the Tribe's reservation. As the distance increases, the Secretary must give greater scrutiny to the Tribe's justification of anticipated benefits from the acquisition, and greater weight to the concerns of local governments. The Tribe's reservation and the proposed Monticello parcel are located in the State of New York, approximately 350 miles apart. The Department is concerned that approval of this application would not support the option for tribal members to live on their existing reservation and to have meaningful employment opportunities at the proposed gaming establishment in Monticello because the proposed gaming establishment will not be located within a reasonable commuting distance from the Tribe's reservation.

The Tribe has stated that the proposed off-reservation gaming facility will provide two economic benefits to the Tribe. The first is the income stream from the gaming facility, which can be used to fund tribal services, develop tribal infrastructure, and provide per capita payments to tribal members, and thus can have a positive effect on reservation life. This projected income stream will not be affected by the remote location of the proposed casino from the Tribe's reservation.

The second benefit of the proposed off-reservation gaming facility is the opportunity for job training and employment of tribal members. With respect to this benefit, the remote location of the proposed gaming facility can have significant negative effects on reservation life. Because the proposed gaming facility is not within a commutable distance of the reservation, tribal members who are residents of the reservation will either: a) not be able to take advantage of the job opportunities if they desire to remain on the reservation; or b) be forced to move away from the reservation to take advantage of the job opportunities.

In either case, the negative impacts on reservation life could be considerable. In the first case, the operation of the gaming facility would not directly improve the employment rate of tribal members living on the reservation. A high unemployment rate, with its attendant social ills, is already a problem on the Tribe's reservation. A gaming operation on or close to the reservation would allow the Tribe to alleviate this situation by using its gaming facility as a conduit for job training and employment programs for tribal members. Provision of employment opportunities to reservation residents promotes a strong tribal government and tribal community. Employment of tribal members is an important benefit of tribal economic enterprises.

In this case, the remote location of the proposed gaming facility may encourage reservation residents to leave the reservation for an extended period to take advantage of the job opportunities created by the tribal gaming facility. The departure of a significant number of reservation residents and their families could have serious and far-reaching implications for the remaining tribal community and its continuity as a community.

3

While the financial benefits of the proposed gaming facility might create revenues for the Tribe and may mitigate some potential negative impacts, the Tribe's application fails to carefully address and comprehensively analyze the potential negative impacts on reservation life and does not clearly demonstrate why these negative impacts should be out weighed by the financial benefits of tribal ownership of a remote gaming facility.

**Decision**

The Department's regulations, in 25 C.F.R. 151.3, state that no acquisition of land in trust status shall be valid unless the acquisition is approved by the Secretary. The Department has completed an evaluation of the Tribe's fee-to-trust application for the Monticello parcel and has determined that it will not accept the property into trust.

The Department's evaluation of this off-reservation land-into-trust application has identified several concerns, as outlined above, that lead to a determination that the Department will not exercise its discretionary authority to take the parcel into trust. This decision is a final agency action consistent with the provisions of 25 C.F.R. 2.6(c).

Please be advised that since this land will not be accepted into trust, the proposed site does not qualify for Indian gaming pursuant to IGRA. It is our hope that the Department will be able to work with the Tribe to identify economic development opportunities that we can support mutually.

Sincerely,

James E. Cason

cc:     Regional Director, Eastern Region

4